## GILES v. RAYBURN et al.

### No. 11302.

Court of Civil Appeals of Texas.
San Antonio.

June 23, 1943.

Rehearing Denied July 21, 1943.

Conger & Baskin and Dent Taylor, all of San Antonio, for appellant.

Bernard A. Golding, of Houston, for appellees.

SMITH, Chief Justice.

This action was brought by L. W. Giles against J. E. Rayburn, Lennie Brice, J. S. Futch and G. E. Lockley (and wife). The suit was for an accounting of an alleged partnership business, for accrued profits and for partition of partnership assets. In a trial without a jury the court found that no partnership relation existed between the parties, but only a "working agreement or contract of employment" between Lockley as principal and Giles as employee, under which Giles was entitled to a salary of $200 per month and 20% of the net profits from the operation of a San Antonio branch of Lockley's Houston business operated under his trade name of "Modern Delivery Service." Upon the report of a court-appointed auditor the trial judge found that during Giles' employment twenty per cent of the net earnings of the venture amounted to $2,970.46, from which certain deductions were made, leaving a net balance of $2,117.-88, for which amount judgment was rendered in favor of Giles, not only against Lockley but against Rayburn, Brice and Futch, Giles' fellow employees operating under an identical agreement with Lockley, the principal. And while each of the five parties excepted to the judgment only Giles has appealed.

The case will be stated from undisputed facts and from express and implied findings of the trial judge.

At the inception of the transactions involved in this controversy, G. E. Lockley owned and was operating a local trucking business in the City of Houston in his trade name of Modern Delivery Service, and under a nontransferable permit therefor issued to him by the Railroad Commission of Texas. Lockley owned a fleet of trucks which he was using in the business.

Giles, plaintiff below and appellant here, and appellees Rayburn, Futch and Brice, initiated and joined Lockley in an agree-

ment to operate a trucking business at San Antonio to be devoted to hauling Army supplies and equipment for various United States Army Posts in and around San Antonio. For this purpose it was necessary to have a permit therefor from the Railroad Commission, as well as express authorization from the appropriate Army officials at San Antonio. This latter authorization was secured through the efforts of Giles, and the Railroad Commission permit was secured by way of an amendment to Lockley's existing permit. With the permit and authority in hand the parties were ready to organize and set up the proposed business in San Antonio, which was to be operated as a separate branch and under the existing trade name of Modern Delivery Service, under which Lockley operated his Houston business. As co-adventurers the parties owned or controlled no authority to operate or necessary equipment therefor, or funds with which to finance the venture. They thereupon entered into the following agreement:

First: That Lockley put his amended permit in the business at an agreed value of $1,500, retaining it in his name until the business was incorporated later on, as then agreed upon but never consummated.

Second: That Lockley take three trucks from his Houston business and put them in the San Antonio branch, at an agreed value of $6,700, subject to a mortgage of $1,200.

Third: That Lockley finance the operation of the business, furnish the necessary credit, and assume accruing obligations of the venture.

Fourth: That the personal services of the several adventurers be devoted to the business, "to make a go of it," and as consideration for such services each of the five men would be allowed a salary, or drawing account of $200 per month, and get 20% of the "net profits" of the operation.

The agreement was made effective as of March 9, 1942, and the parties operated thereunder until the ensuing August 11th, when Giles summarily and finally "quit" the business and went to work for a competing concern and was so engaged up to and through the trial of this case. It is conceded that Giles was paid in full the salary earned by him, and that only his interest in the profits of the business is involved here.

It seems to be conceded that Lockley managed the affairs of the business, pur-chased all equipment needed or used, collected and disbursed the proceeds of the business, kept the record of all transactions. He used his personal credit in purchasing supplies and equipment, gave his personal notes therefor. Among the equipment purchased were eight new trucks which were added to the capital assets of the business, along with the Railroad Commission permit and the three trucks originally put in by Lockley. It was further agreed that Lockley was to own and retain title to the capital assets of the business, including, particularly the Railroad Commission permit, the three trucks he put in at the beginning as well as the eight additional trucks and trailers acquired during the operation.

There was no agreement that Lockley's associates were to share in the losses, if any, of the venture.

The agreed value ($1,500) of Lockley's permit and the expense incurred in procuring the amendment thereto; the agreed value ($5,500) of the three trucks put in the business by Lockley and the amount ($1,-200) due on their purchase price, and the "book" value ($17,293) of the eight additional trucks purchased during the period Giles was employed, as well as depreciation upon that equipment, fixed at $7,000, were all repaid to Lockley out of the proceeds of the operation in that they were charged on the books as operating expenses rather than credited to capital assets.

An auditor's report showed that at the end of Giles' employment on August 11, 1942, the gross income from operations aggregated more than $50,000 and the disbursements (including the cost of capital assets and deterioration, as stated) more than $35,000. From those figures the auditor found the net income to be around $16,000 and Giles' 20% thereof, less certain deductions, $2,970. The trial judge found in accordance with that report.

But the trial judge found further, upon questioned evidence, that in its operations the business had overcharged and collected from, but had not paid, the Government certain freight charges amounting to more than $4,000, which the court deducted from the amount of the ascertained net profits and proportionately reduced Giles' 20% thereof, leaving a net amount due him of $2,793, for which judgment was rendered in his favor against Lockley and the other parties to the venture. As stated, all par-

ties excepted to the judgment, but only Giles has appealed.

The decision below presents this anomaly: Assuming they were not partners, as found by the trial court, it is undisputed that Giles, Rayburn, Brice and Futch occupied a common status as co-employees working for Lockley, the sole principal. Under the theory propounded by Lockley and adopted by the trial court, neither of those employees was liable upon the obligation to pay the salary or proportionate net profits earned by either of the other employees. Under the adopted theory Lockley alone, as the alleged owner and employer, was liable upon that obligation. And yet the judgment in favor of employee Giles for his part of the profits of the business was rendered not only against the principal, Lockley, but against Giles' co-employees and Lockley's wife jointly with Lockley as well. As Giles' fellow employees and Mrs. Lockley have not appealed from such judgment, but apparently are resisting Giles' appeal, nothing can be done for them by this Court in this appeal. The anomaly is mentioned here only in view of another trial, when the equities, or true relative status, of all the parties may be adjudicated.

The trial court found that there was no partnership between Lockley and Giles, but that, in effect, the relation between the two was that of employer and employee, whereby for his services Giles was to receive $200 per month and 20% of the net profits of the venture. It is academic that, in general, net profits of an operation are ascertainable by deducting the actual expenses from the gross earnings of the business. The difference between those items constitutes the net profits. If a part of the gross income is appropriated to the purchase of capital assets (such as motor trucks, Railroad Commission permit, as in this case), the cost thereof may not be charged as expenses, but must be allocated to net profits. The correctness of this conclusion is made obvious by the hypothesis that under the contrary rule applied by the trial court Lockley, as the owner of the business, could forever prevent the accumulation of net profits by the simple device of appropriating all surplus earnings of the business to the purchase of additional capital assets, thereby enriching himself at the expense of his employees who were entitled by contract to share in the legitimate net profits of the business. In this case the trial court adjudged such items to be a part of the expenses of operation, and deducted them in computing the net profits of the business. This was error and we sustain appellant's third point raising the question.

Appellant vigorously questions the finding and conclusion of the trial judge that the relation between Lockley and Giles was not that of a partnership, but was only a contract of employment. The point presents a serious question, but since the judgment must be reversed for the stated reason, we will not pass on or discuss this question, but will leave it, without prejudice, for adjudication upon another trial and in accordance with the record made thereon. For like reasons we pretermit any discussion of appellant's remaining points, all of which rest primarily upon the issue of partnership.

Because of the error of the court in excluding from the accounting of net profits the cost of capital assets acquired by the business in question during appellant's employment, the judgment will be reversed and the cause remanded for all purposes.

Reversed and remanded.

## On Motion for Rehearing.

In his motion for rehearing appellee vigorously questions some of the figures used in the opinion of this Court. If any of those figures were in fact inaccurately stated, those inaccuracies were due to confusion in the record and obscure presentation in this Court, and are immaterial in view of another trial, at which it is hoped they may be clarified, and more clearly presented in event of further appeal. In any event those errors, if any, in computation, do not affect the controlling conclusion upon which the judgment has been reversed, to-wit: The erroneous exclusion of the cost of capital assets from the computation of net profits.

Appellee's motion will be overruled.